**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

SABRE56, INC., a foreign corporation,

Plaintiffs,

v

ARKON ENERGY US HOLDCO, INC., a foreign corporation,
NSCALE AS, a foreign corporation, and
JOSHUA PAYNE, an individual

Defendants.
_______________________________________/

WARNER NORCROSS + JUDD LLP
John A. MacKenzie (P80386)
Attorneys for Plaintiffs
12900 Hall Road, Suite 200
Sterling Heights, MI 48313
(586) 303-4100
jmackenzie@wnj.com
_______________________________________/

There is no other pending or resolved matter between these parties and/or resolving out of the same transactions and occurrences.

## COMPLAINT

Plaintiff, Sabre56 Inc., through its counsel, Warner Norcross + Judd, LLP, and for its Complaint, state as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Sabre56, Inc. ("Plaintiff" or "Sabre56"), is a for profit corporation registered in the State of Delaware and that conducts business around the U.S., including in the State of Michigan.

2. Defendant, Arkon Energy US Holdco, Inc. ("Defendant" or "Arkon"), is a for profit corporation registered at 251 Little Falls Drive, Wilmington, Delaware 19808, with its principal place of business in Sydney, Australia.

3. Defendant, Nscale AS ("Defendant" or "Nscale"), is a for profit entity that is headquartered in Norway and that conducts business throughout the U.S.

4. Defendant, Joshua Payne ("Defendant" or "Payne"), is an individual who resides in London, England.

5. Jurisdiction is proper in this Court because the parties' are foreign corporations that reside in different countries, and the amount in controversy exceeds $75,000. 28 USC 1332.

6. Venue is proper in this court because the parties conduct business through the United States, including in Michigan. 28 USC 1391(c)(3).

## **GENERAL ALLEGATIONS**

7. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

8. Plaintiff Sabre56 specializes in providing block chain consulting and data management services to support digital infrastructure.

9. Defendant Arkon specializes in developing digital infrastructure.

10. Arkon develops institutional-grade data centers for the bitcoin network.

11. Defendant Nscale is an affiliate of Arkon that specializes in providing datacenter services.

12. Defendant Payne is the founder and Chief Executive Officer ("CEO") of both Arkon and Nscale.

13. On December 21, 2023, Sabre56 and Arkon entered into a Post-closing Agreement ("PCA"), which was intended to guide the parties post-closing conduct and business affairs in relation to the Asset Purchase Agreement ("APA") and Master Managed Services Agreement ("MMSA"). (**Exhibit A**: Post-closing Agreement).

14. The PCA required Arkon to acquire rights to operate facilities wherein Sabre56 would provide certain services under the Engineer, Procure and Construct Agreements ("EPC Agreement") and the MMSA.

15. The deadline for Arkon to perform under the PCA was December 21, 2024.

16. The PCA states, in relevant part, as follows:

> This binding post-closing letter agreement (this "Agreement") sets forth the post-closing terms concerning proposed transactions to occur after the closing of the APA and signing of the MMSA (the "Post-Closing Transactions").
>
> **EPC Agreements**
>
> Subject to the parties mutually agreeing to the form and material terms and conditions of the EPC Agreements, in the unlikely event that Arkon fails to acquire rights to operate Facilities for development and operation

amounting to an aggregate of 150MW capacity within 12 months following the execution of this Agreement, and such failure is not caused or contributed to by Sabre's failure to perform its obligations under this Agreement, the APA, MMSA or any of the definitive agreements referred to or contemplated by this Agreement, subject in each case to any applicable notice and cure periods, then liquidated damages as set forth herein shall be due from Arkon to Sabre.

Liquidated damages will be calculated at a rate of USD $30,000 per MW of undeveloped capacity. For example only, 12 months after the execution of this Agreement, should Arkon and/or NewCos have entered into binding EPC agreements with Sabre for only a total of 120MW, then Arkon would owe Sabre liquidated damages of USD $900,000, being equal to (150MW - 120MW) x USD 30,000/MW. The liquidated damages payable by Arkon shall be reduced on a pro-rated basis for any undeveloped capacity caused or contributed to by a failure on Sabre's part to perform any of its obligations under this Agreement, the APA, MMSA or any of the definitive agreements referred to or contemplated by this Agreement, subject in each case to any applicable notice and cure periods.

**Operating Agreement / Management Services Agreement**

In the unlikely event that Arkon fails to secure Facilities that require Operations Management amounting to 234MW in the aggregate within 12 months following execution of this Agreement, and such failure is not caused or contributed to by Sabre's failure to perform any of its obligations under this Agreement, the APA, MMSA or any of the definitive agreements referred to or contemplated by this Agreement, subject in each case to any applicable notice and cure periods, then liquidated damages as set forth herein will be due from Arkon to Sabre. Liquidated damages will be calculated at a rate of USD $1,095 per MW, per month of undeveloped capacity up to a maximum of 6 months, up to a maximum aggregate of $1,100,000. For example only, 12 months after the execution of this Agreement, should Arkon and/or NewCos have entered into binding amendments to the MMSA with Sabre for only a total of an additional 220MW, Arkon would owe Sabre liquidated damages of USD $551,880, being equal to (234MW - 220 MW) x USD 1,095/MW-month x 6 months. The liquidated damages payable by Arkon shall be reduced on a pro-rated basis for any undeveloped capacity

> caused or contributed to by a failure on Sabre's part to perform any of its obligations under this Agreement, the APA, MMSA or any of the definitive agreements referred to or contemplated by this Agreement, subject in each case to any applicable notice and cure periods.
>
> **Assignment**. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any rights, interests or obligations hereunder, without the prior written approval of the other Party. Any assignment in contravention of this Section 11 shall be *void ab initio.*
>
> **Further Assurances**. Each Party agrees to provide such information, execute and deliver any instruments and documents, and to take such other actions as may be necessary or reasonably requested by the other Party, which are not inconsistent with the provisions of this Agreement and which do not involve assumptions of obligations or materially affect the cost of performance, other than those provided for in this Agreement, in order to give full effect to this Agreement and to carry out the intent of this Agreement.

(**Exhibit A**).

17. During 2023-2024, Arkon had acquired certain facilities and/or engaged in discussions to acquire certain facilities under the PCA in the following locations:

a. Hannibal, Ohio;

b. Ables Springs, Texas;

c. Lavon, Texas; and

d. Hopedale, Ohio.

(referred to collectively as the "Facilities").

18. In late-2024, Arkon had not engaged Sabre56 for EPCM or services under the MMSA.

19. Upon information and belief, Arkon had acquired rights to develop Ables Springs and Lavon; however had not engaged Sabre56 for EPCM services as required under the PCA.

20. Instead, Arkon mislead Sabre56 to assume that it would be engaged, by having Sabre56 conduct preliminary services for design and engineering simultaneous to refusing to sign the EPCM agreement as required by the PCA.

21. It is now clear that Arkon engaged Sabre56 with the hidden agenda to have Sabre56 prepare both Ables Springs and Lavon for sale, without ever entering into the EPCM agreements.

22. This is fraudulent and misleading conduct as Sabre56 exhausted time, money, and resources to prepare the Ables Springs and Lavon facilities with the understanding that Arkon was going to perform under the PCA in good faith.

23. It was becoming clear that Arkon was not going to be able to perform under the PCA by the December 21, 2024 deadline.

24. In light of Arkon's anticipated breach of the PCA, on October 4, 2024, Sabre56 sent a notice to Arkon and requested assurances that Arkon would perform on or before the December 21, 2024 deadline.

25. Sabre56 requested updates on the following proposed projects under the parties' various agreements:

a. Hannibal expansion efforts from 40MW to ~96MW;

b. Ables Springs start date;

c. Lavon start date;

d. An update on the balance of 70MW of EPCM as per section b – EPCM agreements (provided EPCM agreements for Lavon and Ables Springs are executed);

e. An update on the balance of 172MW of O&M as per section c - Operating Agreement/Management Services Agreement (234MW less 62MW currently contracted under the MMSA).

(referred to collectively as the "Proposed Projects").

26. Section 12 of the PCA requires Arkon to respond in good faith to Sabre56's request for assurances, and to provide relevant information.

27. Arkon refused to provide any update and/or assurances; and instead, Arkon engaged in a scheme to liquidate its assets and rights to the Facilities in an effort to minimize exposure to Sabre56 for breaching the PCA.

28. Arkon has not and will not perform under the PCA as it has sold and assigned all of its interest in the Facilities that were the subject of the PCA.

29. Arkon breached the PCA, *inter alia*, as follows:

a. By failing to acquire the facilities necessary for Sabre56 to provide 150MW services under an EPC Agreement on or before December 21, 2024;

b. By acquiring only 62MW of its 234MW obligation for Sabre56 to provide services under the MMSA on or before December 21, 2024, which is a shortfall of 172Mw; and

c. By failing to provide further assurances required under Section 12 of the PCA.

30. Arkon's breach of the PCA damaged Sabre56 as Sabre56 lost revenue and profit expected from operation and management of the Facilities under the PCA, and Sabre56 is entitled to liquidated damages in the amount of $2 million.

31. As a result of Arkon's aforementioned breaches of the PCA, the liquidated damages clause in the PCA has been triggered.

32. Under Section 2(b) of the PCA, Arkon owes Sabre56 $4.5 million in liquidated damages.

33. Under Section 2(c) of the PCA, Arkon owes Sabre56 $5.6 million in liquidated damages.

34. Section 16 of the PCA limits the aggregate amount of liquidated damage liability to $2 million, which caps Arkon's liability at this amount.

35. Sabre56 spent time, money, and resources to prepare for EPCM operation in both Ables Springs and Lavon, only for Arkon to fail to perform under the PCA and to assign the rights to those facilities to Arkon's affiliate – Nscale.

36. As for the other Facilities and Proposed Projects, upon information and belief, Arkon sold its rights in both Hopedale and Hannibal Facilities to Mara Holdings, and assigned the MMSA to Mara in that transaction ("Mara Deal").

37. Arkon did this without any notice or discussion with Sabre56 in effort to conceal the transaction.

38. The Mara Deal made clear that Arkon will not engage Sabre56 under the MMSA or PCA because Arkon no longer has any interest in the necessary Facilities to do so.

39. Also, during the relevant timeframe, Sabre56 had acquired rights to operate a 30 MW Data Center Facility to Interconnect with the City of Wilson 115 kV Transmission Line at the real property legal described as:

> Being all of Lot 3 as shown on that certain plat entitled "Hackey Industrial Park. Property of Wilson County Properties, inc." Recorded in Plat Book 18 at Pages: 142-143, Wilson County Registry.

("Wilson Property")

40. On or about March 4, 2024, Sabre56, Arkon, and Nscale negotiated an Assignment and Assumption Agreement for the Wilson Property ("Wilson Assignment").

41. In the Wilson Assignment, Sabre56, Arkon, and Nscale agreed in relevant part, as follows:

a. Sabre56 will (i) introduce to Nscale the Owner and the opportunity with respect to the Property and (ii) assign to Nscale all of Sabre56's rights, title and interest in the Property, inclusive of the Load Study and the Option Agreement Form, and Nscale, subject to the terms and conditions hereinafter set forth, agrees to assume those obligations of Sabre56 set forth herein from and after the Effective Date;

b. In consideration for such assignment to Nscale, Nscale has also agreed that, should it enter into an agreement to lease or close on the purchase of the Property from the Owner, subject to the terms and conditions hereinafter set forth, it will also enter into an exclusive engineering, procurement and construction agreement (an "EPC Agreement") with Sabre56 with respect to enabling the infrastructure (i.e., site preparation, electrical supply and data supply) for the Property only; and

c. Sabre56 and Nscale agreed that upon execution of this Assignment, the PCA shall be amended *mutatis mutandis* as follows (i) to delete Section 2.a.I of the PCA as well as all remaining instances of the "Wilson Deposit" and "Wilson Breakage Fee" referred to in the PCA, and (ii) to revise the amount of the liquidated damages cap set forth in Section 16 to $1,000,000 (collectively, "**PCA Amendment #1**"), and hereby acknowledge that the Property shall not be deemed to be a "New Facility" as such term is defined in the PCA.

(**Exhibit B**: Wilson Assignment).

42. Plaintiff Sabre56 has now learned that Defendants initiated and negotiated the Wilson Assignment in bad faith and for the sole purpose of limiting exposure under the PCA by lowering the liquidated damaged from $2 million to $1 million.

43. Upon information and belief, Arkon never had good faith intent to lease or purchase the Wilson Property. The Wilson Assignment was done solely to trick Sabre56 into lowering the liquidated damage liability under the PCA.

44. Also, as of November 2024, Defendant Payne formally ended his position as the CEO of Arkon, and identified himself as the CEO of Defendant Nscale. This further demonstrates the fraudulent and colluded scheme among Defendants, as alleged in further detail below.

45. As demonstrated by the aforementioned allegations, Defendants colluded and engaged in a series of deceptive and fraudulent conduct, as follows:

a. Defendant Payne, on behalf of Arkon and Nscale induced Sabre56 to enter into the Wilson Assignment under the false pretense that Nscale would lease or purchase the Wilson Property, and then enter into an EPC Agreement with Sabre56, which Sabre56 expected to derive revenue and profit;

b. The PCA was entered into on December 21, 2023. Thereafter, Defendants knew that Arkon could not perform on or before December 21, 2024 and that the liquidated damages clause would be triggered; so, Defendants fraudulently induced Sabre56 into the Wilson Assignment to lower exposure under the PCA. The Wilson Assignment is dated March 4, 2024, three months after the PCA was entered into.

c. In reality, the Wilson Assignment was a sham. Payne induced Sabre56 into the Wilson Assignment with the hidden purpose to lower Arkon's liquidated damages liability from $2 million to $1 million under the PCA.

d. Defendants never had a good faith intent to enter in an EPC Agreement with Sabre56 for the Wilson Property.

e. Similarly, Arkon engaged Sabre56 to prepare both Ables Springs and Lavon for operation under the PCA and MMSA; however, Arkon's hidden intent was never to perform under the PCA. Rather, Arkon used Sabre56 to prepare the facilities for sale to a third party for the financial benefit to Arkon and detriment of Sabre56.

f. Payne, Arkon, and Nscale's egregious and fraudulent conduct is further demonstrated by Arkon selling and/or transferring all of its interest in the Facilities to Nscale and Mara, which terminated all opportunity for Sabre56 under the PCA and Wilson Assignment.

(referred to hereinafter as the "Fraudulent Acts").

46. Under the guise of the Fraudulent Acts, Arkon rid itself of all assets, and reduced its exposure to Sabre56 under PCA from $2 million to $1 million.

47. Because of the Fraudulent Acts that induced Sabre56 into the Wilson Assignment, the liquidated damages liability under the PCA should remain $2 million.

48. Arkon should be estopped and prohibited from benefiting from its fraudulent conduct.

49. Arkon engaged in fraud and bad faith when negotiating the Wilson Agreement and PCA, which damaged Sabre56, among other things, as follows: Sabre56 had invested approximately $100,000 in time, money, and resources to being EPCM operations at Lavon and Ables Springs; liquidated damages in the

amount of $2 million under the PCA; lost rights to the Wilson Property under the Wilson Assignment; and attorney fees and costs.

50. Arkon's transfer of assets to Nscale and transition of the executive team from Arkon to Nscale was a *de facto* merger, and Nscale is liable to Sabre56 for the $2 million in liquidated damages under the PCA, and for all other damages arising under the PCA and Wilson Assignment.

51. Nscale has successor liability for Arkon and Nscale's fraud and collusion defined above as the Fraudulent Acts above.

52. All Defendants should be disgorged of any and all compensation, income, profit, and or remuneration received from the transfer of any of the Facilities and/or Proposed Projects to Mara, Nscale, and/or any other third party.

## COUNT I
## BREACH OF CONTRACT – THE PCA
## (against Arkon only)

53. Plaintiff incorporates all previous allegations as if fully restated herein.

54. Plaintiff Sabre56 and Defendant Arkon entered into a valid and binding contract, the PCA.

55. The PCA required Arkon to acquire certain facility rights on or before December 21, 2024, and for Sabre56 to provide management and operational services at the acquired facilities.

56. The deadline for Arkon to perform was December 21, 2024.

57. Arkon failed to perform and the liquidated damages clause is triggered.

58. Arkon refuses to pay the $2 million in liquidated damages, which is a breach of the PCA.

59. Arkon breached the PCA by failing to perform on or before December 21, 2024, *inter alia*, as follows:

a. Failing to acquire rights to operate Facilities for development and operation amounting to an aggregate of 150MW capacity within 12 months following the execution of this PCA.

b. Refusing to pay liquidated damages calculated at a rate of USD $30,000 per MW of undeveloped capacity.

c. Failing to secure Facilities that require Operations Management amounting to 234MW in the aggregate within 12 months following execution of this PCA.

d. Refusing to pay liquidated damages calculated at a rate of USD $1,095 per MW, per month of undeveloped capacity up to a maximum of 6 months, up to a maximum aggregate of $1,100,000.

e. Refusing to provide further assurance and information in good faith in response to Sabre56's October 4, 2024 request.

f. Refusing to pay $2 million in liquidated damages to Sabre56.

60. Defendant Arkon's aforementioned breaches damaged Sabre56, among other things, time and capital infused into preparation for facility operation under the PCA; and liquidated damages up to the $2 million cap.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendant, as follows:

A. Award Plaintiff $2 million in liquidated damages, plus interest, costs, and attorney fees;

B. Award money damages, and all other legal and equitable relief as this Court considers just and proper.

**COUNT II**
**BREACH OF CONTRACT AND RESCISSION OF THE WILSON ASSIGNMENT**
**(against Arkon and Nscale)**

61. Plaintiff incorporates all previous allegations as if fully restated herein.

62. Plaintiff Sabre56, and Defendants Arkon and Nscale entered into a valid and binding contract, the Wilson Assignment.

63. The Wilson Assignment required Sabre56 to assign its rights in the Wilson Property to Nscale; and in return, Nscale was required to enter into an exclusive EPC Agreement with Sabre56 with respect to enabling the infrastructure (i.e., site preparation, electrical supply and data supply) for the Wilson Property.

64. Defendants entered into the Wilson Assignment in bad faith and without ever intending to perform.

65. The Wilson Assignment was a sham and used by Arkon only to lower its liability under the PCA.

66. Plaintiff has not and will not receive the benefit of its bargain as

Defendants will not enter into an EPC Agreement with Plaintiff; and because of Defendants' wrongful and fraudulent acts, there has been a breakdown in the relationship that would prevent an EPC Agreement from being consummated.

67. Defendants negotiated the Wilson Agreement in bad faith and committed fraud, which warrants rescission. There is no quid pro quo.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendants, as follows:

A. Award money damages to Plaintiff for lost revenue, profit, and interest in the Wilson Property, plus interest, costs, and attorney fees;

B. Order rescission of the Wilson Assignment; and

C. Award such other legal and equitable relief as this Court considers just and proper.

## COUNT III
## FRAUDULENT MISREPRESENTATION

68. Plaintiff incorporates all previous allegations as if fully restated herein.

69. Defendants conspired and engaged in the Fraudulent Acts defined above.

70. At the time Defendants made the representations as alleged in the Fraudulent Acts, they were false.

71. Specifically, Defendants intentionally induced Plaintiff into the Wilson Assignment with the sole and hidden purpose of lowering liability under the PCA

Agreement from $2 million to $1 million.

72. Defendants knew that Arkon was insolvent and liquidating assets when the Wilson Assignment was negotiated and entered into, which is bad faith.

73. The Fraudulent Acts defined above are reasserted and incorporate herein.

74. Defendants made the false representations with the intent to induce Plaintiff to enter into the Wilson Assignment to lower exposure under the PCA.

75. Defendants made these misrepresentations for their own financial gain – to lower exposure under the PCA from $2 million to $1 million.

76. Plaintiff reasonably relied on the representations of Defendants evidenced by Plaintiff's entry into the Wilson Assignment.

77. During the relevant timeframes, Plaintiff did not know that Arkon was insolvent, liquidating assets, and merging into Nscale.

78. Plaintiff suffered damages, including but not limited to, lost time, money, and resources invested into the expected EPC Agreement for the Wilson Property; liquidated damages being reduced from $2 million to $1 million under the PCA; lost rights to the Wilson Property under the Wilson Assignment; and attorney fees and costs.

WHEREFORE, Plaintiff Sabre56 respectfully requests that this honorable Court enter judgment in its favor and against the Defendants, and award Plaintiff

damages in excess of $2,000,000 plus attorney fees and costs, and award any and all other legal and equitable relief that this Court deems proper and just.

**COUNT IV**
**INNOCENT MISREPRESENTATION**

79. Plaintiff incorporates all previous allegations as if fully restated herein.

80. Defendants' aforementioned misrepresentations and Fraudulent Acts were made in connection with the making of a contract – the Wilson Assignment.

81. Plaintiff would not have entered into the Wilson Assignment if it wasn't for Defendants' aforementioned, repeated and continuous misrepresentations – the Fraudulent Acts.

82. Plaintiff suffered substantial loss and damages as a result of entering into the Wilson Assignment, which was induced by Defendants' misrepresentations.

WHEREFORE, Plaintiff Sabre56 respectfully requests that this honorable Court enter judgment in its favor and against the Defendants, and award Plaintiff damages in excess of $2,000,000 plus attorney fees and costs; order rescission of the Wilson Assignment; and award any and all other legal and equitable relief that this Court deems proper and just.

**COUNT V**
**SUCCESSOR LIABILITY**

83. Plaintiff incorporates all previous allegations as if fully restated herein.

84. Defendant Arkon and Defendant Nscale are affiliated entities.

85. Defendant Arkon dissolved and liquidated all of its assets and transferred money and assets into Defendant Nscale for the specific purpose of avoiding liability and exposure to Plaintiff for breaching the PCA, misled Sabre56 into the Wilson Assignment, and the Fraudulent Acts.

86. Defendants knew that Arkon was not going to be able to perform under the PCA and that Arkon would owe Sabre56 $2 million in liquidated damages. This is why Arkon dissolved and transferred all assets and its executive team to Nscale.

87. This is why Arkon and Nscale negotiated the Wilson Assignment three months after the PCA.

88. Arkon has essentially merged into Nscale for the purpose of defrauding Plaintiff.

89. Nscale and all Defendants should be disgorged of their ill-gotten gains, which includes but is not limited to, all revenue and profit derived from any of the Facilities and/or Proposed Projects; and Defendants should not be able to enjoy the fruits of their fraudulent conduct.

90. The corporate veil should be pierced and Defendant Payne should be held personally liable for his egregious and fraudulent conduct, and all damages to Plaintiff.

WHEREFORE, Plaintiff Sabre56 respectfully requests that this honorable Court enter judgment in its favor and against the Defendants, and award Plaintiff

damages in excess of $2,000,000 plus attorney fees and costs, and award any and all other legal and equitable relief that this Court deems proper and just

Warner Norcross + Judd LLP

*/s/ John A. MacKenzie*
John A. MacKenzie (P80386)
Attorneys for Plaintiffs
12900 Hall Road, Ste. 200
Sterling Heights, MI 48313
(586) 303-4100
jmackenzie@wnj.com

Dated: January 22, 2025